**RECEIVED**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

JUN 0 3 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| **CYNTHIA NARDELLA** ) | 15cv4885 |
| **guardian and as Parent** ) | Judge Marvin E. Aspen |
| **C.D.** ) | Magistrate Judge Sheila M. Finnegan |
| **Plaintiffs** ) | |
| **v.** ) | |
| **Board of Education of Leyden Township** ) | |
| **School District # 212** ) | |
| **Illinois State Board Of Education** ) | |
| **Leyden Area Special Education Co-op (LASEC)** ) | |
| **Kathrine Robbins** | |
| **Melinda McGuffin** | |
| **Nancy Coleman** | |
| **Hillside Academy** | |
| **Dr. Lynne Nicholas** | |
| **Nancy Mutterer** | |
| **Glen Oaks Therapeutic Day School** | |
| **Adventist Glen Oaks Hospital** | |
| **Thomas Kaufman** | |
| **Lisa Grigsby** | |
| **Dr. Anna Hammond** | |

## COMPLAINT

NOW COMES PLAINTIFFS CYNTHIA NARDELLA, C.D. by and through Cynthia Nardella, and as their complaint states as follows:

**INTRODUCTION**

1.      This cause of action arises from the efforts of Cynthia (*) Nardella to enforce the right of her son to a free appropriate education ("FAPE"). This action is a timely appeal of an administrative ruling issued by Impartial Hearing Officer Phillip C. Milsk, Ed.D.("IHO") on February 5, 2015, rendered following a two day special education due process hearing pursuant to the Individuals with Disabilities Educational Improvement Act ("IDEA"), 20 U.S.C. § 1401 et seq.  See Decision and Order, attached as Exhibit A.

2.      The IHO'S decision and Order is being appealed because of (a) significant incorrect procedural rulings before and during the administrative hearing the substantially affected the scope of the evidence to the detriment of Cynthia (*) Nardella and C.D., (b) the IOH's misapplication of important legal standards under IDEA, (c) errors in findings of Fact, and improprieties committed by the IHO that bring his impartiality in to question.

3.      Intentionally with malice and forethought the defendant's took actions to defame Plaintiffs characters and aide District 212 in coercing placement at Glen Oaks for the sole purpose of favorable content in the psychological reports and omissions of trauma. Defendants intentionally and willfully helped each other in cooperative actions to deny C.D. his constitutional rights under IDEA, to deny related independent psychological services for C.D. at district expense under FAPE. Willingly with malice and forethought District 212 and LASEC TAS tampered with evidence and falsified official school documents and Official IEPs to favor District 212. These actions directly caused Emotional Distress and great pain and suffering to Ms. Nardella's Family.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction pursuant to 28 U.S.C.  § 1331 and 20 U.S.C.  § 1415(i)(2) and 28 U.S.C. § 1367.

5       Venue is properly situated in this Court because the acts complained of occurred and the parties reside in, or due business in, Northern District of Illinois.

**PARTIES**

6.      C.D. is a young man with Autism who also has noticeable obsessive compulsive characteristics associated with Obsessive Compulsive Disorder ("OCD") and noticeable characteristics of attention deficient and hyper-activeness associated with Attention Deficient Hyperactive Disorder ("ADHD). He is extremely high functioning.

7.      Cynthia Nardella is C.D's mother and has the authority to advocate C.D's educational rights delegated to her by CD. At all times pertinent, Cynthia Nardella (parent) has been a legal resident of Franklin Park, Illinois and tax payer in Leyden High School District 212.

8.      Defendants Board of Education for Leyden Township High School District 212 ("Dist.212"), which serves residents of Franklin Park, among other suburbs of Chicago is a school district located in the Northern District of Illinois and is the body politic and corporate organized pursuant to the Illinois School Code. By federal and state law, Dist. 212 is responsible for ensuring that students with disabilities residing within its District, are provided with a free and appropriate public education (FAPE). **20 U.S.C. § 1415(a); 105 ILCS § 5/14-1** *et seq.*

9.      Defendant Illinois State Board of Education ("ISBE") is the state agency authorized and required to establish a procedure for resolving disputes between students and their parents and local school districts under IDEA. ISBE has been named in this action for purpose of filling the administrative record in this case.

10.     Leyden Area Special Education Cooperative (LASEC) works with Dist. 212 in coordinating appropriate outside placement for students with disabilities. They have knowledge of available appropriate outside placement sites that service Dist. 212 and the needs of the student, and are to" work with the district", ON THE STUDENTS BEHALF, to ensure the placement is appropriate for the students' needs under IDEA and ensure placement provides appropriate program to ensure FAPE, which includes ensuring all appropriate related services are available.

11.     Dr. Kathrine Robbins former District 212 Superintendent for Leyden High Schools. Dr. Robbins was in attendance at Independent Educational Program ("IEP") meeting on 1/23/13. Dr. Robbins was asked to be in attendance by the Plaintiff. Dr. Robbins informed Cynthia Nardella in a phone call before the meeting that she had the authority to authorize services for C.D. and answer her questions involving personnel and treatment of her son over the last 5 years.

12.     Melinda McGuffin LASEC Director formally employed by Dist.212 as its special education coordinator for all of Christian's Leyden school years through 2013. Ms. McGuffin was in charge of all meetings that followed through 2/19/13.

13.     Nancy Coleman is a LASEC employee and the Technical Assistance Supervisor (TAS) who was assigned to facilitate C.D.'s outside placement for Dist. 212. She also did the note taking (on laptop) during the meetings and the filing of the notes into IEP's 1/23/13, 1/30/13, 2/4/13, and 2/6/13. She was also present for all meetings and placement tours up to 2/6/13.

14.     Hillside Academy is an outside placement facility used by District 212 for the outside placement of students with disabilities. They have two sites. One is located in Aurora the other in Hillside. They have worked with Dist. 212 for a number of years.

15.     Dr. Lynne Nicholas is the Director of Operations (Special Education) for Hillside Academy. Dr. Nicholas is extremely knowledgeable of the programs and sites used at Hillside Academy and which were running at the time that could accommodate an immediate placement from Dist. 212.

16.     Nancy Mutterer is the Director of Hillside Academy and set up the 1/29/13 consideration tour attended by plaintiffs and Individuals representing District 212. Ms. Mutterer had full and direct knowledge of what programs and sites were available for immediate placement of an outside student. Nancy Mutter was also aware that only the Hillside location was being considered by plaintiffs.

17.     Glen Oaks Therapeutic Day School is an outside placement facility used by District 212 for the outside placement of students with disabilities. They have worked with Dist. 212 for a number of years.

18.     Adventist Glen Oaks Hospital is the parent company for Glen Oaks Therapeutic Day school. Dr. Anna Hammond is employed in their Psychology department.

19.     Thomas Kaufman a doctoral student who was under the supervision of Doctor Anna Hammond at Glen Oaks Therapeutic Day School to include the dates of 2/6/13 to 4/1/13. During this time he administered the testing for C.D.'s evaluation/trauma assessment and also did the observations and notes for the report that was part of IEP 3/12/13. During this process he spoke with Ms. Nardella several times to include an extremely long conversation on 3/14/13 in which he conferred with/informed Ms. Nardella of his observations and recommendations for C.D.'s social/emotional related services for health and educational IEP needs. Mr. Kaufman agreed to send Ms. Nardella a copy of his note and finding for comparison by an independent evaluator.

20.     Lisa Grigsby is the Director for Glen Oaks Therapeutic Day School and was present on 1/31/13 for the consideration tour for placement in their facility by plaintiffs and individuals representing District 212. She personally informed Ms. Nardella of the criteria for becoming a candidate for Glen Oaks' program. This information included criteria that would constitute no consideration at all for candidacy as students fitting that criteria would be harmful to students already enrolled.

21.     Dr. Anna Hammond is a licensed Clinical Psychologist with Adventist Glen Oaks Hospital and "consultant" for Glen Oaks Therapeutic Day school for educational evaluation involving IEPs. She was the direct supervisor over Thomas Kaufman and signed the report mailed to Ms. Nardella on 3/19/13 for IEP 3/12/13 although report was done on 3/8/13.

### OVERVIEW OF APPLICABLE LEGAL STANDARDS

22.     The IDEA, formerly the Education of All Handicapped Children Act, **20 U.S.C § 1400** *et seq.,* was enacted to ensure that all children with disabilities in the United States are provided with FAPE. 20 U.S.C. § 1414(d).

23.     A FAPE is defined in IDEA as special education and related services provided at public expense, under public supervision and direction, and without charge that is provided in conformity with the child's Individualized Educational Program ("IEP").    **20 U.S.C. §1401(9); 34 CRF § 300.17,    §300.39.**

24.     The IDEA and its implementing regulations permit placement in special classes or separate schools when the nature of the severity of the disability is such that education with the help of supplementary aids and services cannot be achieved satisfactorily. The school district must offer a continuum of placements to implement the child's IEP and to provide a FAPE. **20 U.S.C. § 1412(a) (5); 34 CFR § 300.115.**

25.     The school district must develop an IEP for each child with a disability that includes measurable goals, calculated to provide the child meaningful educational benefit. **20 U.S.C. §1414; 34 CFR § 300.320.**

26.     The IEP is the "modus operandi" of the entitlement to a FAPE. *Sch. Com. of the Town of Burlington v. Dept. OF Educ. Of Massachusetts, 471 U.S. 359, 368 (1985).*

27.     "Meaningful educational benefit" requires that a student receiving a special education must achieve more than "de minims" or trivial progress to receive FAPE.  *Polk v. Central Susquehanna Intermed. Unit 1, 853 F.2d 171 (3rd Cir. 1988)*

28.     The IDEA also contains procedural safeguards established to protect parents and allow them meaningful participation in their child's education, and dictates, among other things, how school districts must obtain parental consent, conduct meetings, give prior written notice to changes in the child's educational program, provide the parent with progress reports, review evaluations and other current information concerning a child's, and develop appropriate IEP's for the student. **20 U.S.C. §1414, §1415.**

29.      A school is required to use peer reviewed, scientifically based methodologies to educate a disabled child, to the extent practicable. **34 CFR §300.320; §300.35.**

30.     A student's educational placement must be based on the student's IEP. **20 U.S.C. §1401 (a); Evans v Bd. Of Educ. Of Rhinebeck Cent. Sch. Dist., 930 F. Supp. 83 (S.D.N.Y. 1996)** It is a violation of FAPE for the school to predetermine a  student's placement based on reasons other than the student's educational needs*. See. e.g.,* **Speilberg v. Henrico County Public Sch., 8523 F.2d 256 (4th Cir.1988)**

31.     Federal and state law provide parents the right to request an impartial due process hearing if they disagree with any matter related to the identification, evaluation and educational placement of the child, or the provision FAPE to the child. **20 U.S.C. § 1415 (b)(6) and (d)(2)(i).  105 ILCS 5/14-8.02a.**

32.     A parent may complain about IDEA violations that occur up to two years before the parents of the disabled child, request a due process hearing, and in some cases, may complain about events occurring more than two years before the hearing request. *See* **20 U.S.C. §1415(b)(6); 34 CFR § 300.507.**

33.     The IDEA has been interpreted to put the burden of proof on the moving party. Typically the parents of a disabled child, and consequently requires that the parent have equal access to the information related to the student with a disability held by the school district, including outside placement records when placed by a public school into an alternative placement. **Schaffer v. Weast, 126 S Ct. 528 (2005).**

34.     Supplemental Jurisdiction (28 USC 1367) allows claims that could not have entered federal court on their own to be heard by a federal court if they are part of a case over which the court has subject matter jurisdiction. **28 U.S.C § 1367**

## FACTS

35.     District 212 placed C.D., a student with Autism and a specific learning disability, in regular and instructional special education classrooms with non-disabled students and/or students of varying disabilities and abilities for 6 school years from 2007 to 2013.

36.     Over this 6 years period, District 212 offered C.D. very few independent related services to address his social/emotional behavior and its effects on his relationship with staff and peers. Any accommodations agreed to by District 212 personnel were only implemented (for a few days/weeks) to placate Ms. Nardella and were stopped with no warning.

37.     Starting in February of 2008, Ms. Nardella had several meetings and phone calls with District 212 personnel. Problems associated with C.D.'s disability were discussed and accommodations were discussed to make the transition from grammar to high school easier. District stated they would get back with parent on accommodations before the start of school. Ms. Nardella never heard from them.

38.     One week before C.D. entered District 212 to start freshman year 2007-2008, Ms. Nardella had a meeting with District 212 personnel to discuss problems Ms. Nardella foresaw happening and to ask about the accommodation the district stated they would have in place for the start of the year. Ms. Nardella was told at this time that C.D. needed to learn how to adapt to the real world and no accommodations were going to be made, and the new requests were denied.

39.     During the 2007-2008 school year, C.D. started having problems almost immediately. District 212 continually refused to follow the IEP or make accommodations. Districts untrained staff who did not know how to work with Autistic students and the Dist.212 special ed. department continued refusal to make any accommodation caused Christian to feel alienated from his peers and caused C.D. to develop OCD and ADHD behaviors to deal with the stress.

40.     On May 1, 2008 District 212 director of special education Melinda McGuffin headed an IEP meeting. Ms. McGuffin stated at this meeting that she would take over C.D.'s case personally to insure no further problems would arise in following his IEP or accommodating his needs. Outside of 1 meeting in September 2008 to discuss transportation issues, Ms. Nardella never heard from Melinda McGuffin nor saw her again until the discussion for the meeting of IEP 1/23/13.

41.     While in District 212 problems with/by the transportation department occurred regularly. Not being picked up in the morning. Being told to shut up and get off at the wrong address and being left at school caused problems both in school and at home. Excuses for these continuous problems caused extremely poor relations between Ms. Nardella and Dist. 212 transportation dispatchers.

42.     During school years 2008 to 2011, Ms. Nardella had several talks in person and on the phone with Tom Truesdale the district's social worker. When Ms. Nardella spoke with Mr. Truesdale about emotional difficulties C.D. was having at the time and asked him to talk to C.D. when they met next and help him deal with these personnel issues, Mr. Truesdale always answered he would talk to C.D. during "their" next session. Ms. Nardella was told that her son was receiving 40 min. of direct social work services to deal with his emotional/social issues and was led to believe Mr. Truesdale gave 1:1 counseling to him every other week. It wasn't until the due process hearing when Mr. Truesdale testified that Ms. Nardella became aware all C.D.'s social work services were done in a group and Mr. Truesdale had only given direct help to Christian a few times in 2010 at the end of his of junior year.

43.     Repeated actions by District 212 personnel, who were well aware of the reaction by C.D. to certain triggers, caused C.D.'s mental health to deteriorate to the point he had a total shut down of

consciousness on 11/2/2010. C.D. asked permission to leave his classroom due to emotional upset brought on by a trigger from the teacher. C.D. left the classroom and sat on the stairs in a stairway alcove and blacked out unconscious. Sometime later a visiting administrator found him unresponsive lying there. The school refused to inform the parent how long C.D. was unconscious or why the teacher or aid did not look for him when he did not return to class. District 212 personnel informed Ms. Nardella they thought C.D. was pretending.

44.     Ms. Nardella had a series of meetings with District 212 personnel in C.D.'s last semester of 2011. In lieu of pulling C.D. from the district program the district adjusted his schedule to attending core classes in the a.m. only and spending the rest of the day in the student services waiting area (where certain personnel could not upset him) until the day was over. This adjustment lasted to the end of term. Related service were still being denied.

45.     Districts 212 continued its yearly pattern of refusing services to C.D. to help with his social/emotional issues while at all times aware group social work services were not helping him as his behavior and interaction with Dist.212 personnel and peers became worse. IDEA **§300.34 (a)(2)(10)(v)(vi)(14)(ii)(iii)(v).**

46.     District 212 placed C.D. in their Transition placement program. This program was not appropriate. **§ 300.43(a)(1)(2)(ii)(b).** District 212 Director of program and personnel were not trained to work with Autistic students. C.D. IEP for 3/18/11 sited 90 minutes of direct social work services. District 212 Life Program did not give direct services, only group services were given in this program which made it an inappropriate placement from the start. District 212 was well aware of what its program offered and what C.D. needed. No other options for Transitional Services were offered or considered. These minutes were again put in to placate the parent with no intention of giving the services.

47.     District 212 personnel assured Ms. Nardella that the Life (Apartment) Program personnel were trained and more patient and understanding then 9-12 staff and abusive behavior would not occur in their Apartment Program. District 212 Director for the program Kathy Klaus was made fully aware of everything that had been alleged by Ms. Nardella as to the behavior by personnel at the West Campus and C.D.'s emotional/social state/ behavior and attitude towards staff in March 2011 prior to deferred graduation in May 2011.

48.     District 212, in the form of Life Apartment Program Director Kathy Klaus, showed aggressive and abusive behavior towards C.D. two weeks after entering the program for the 2011-2012 school year. While completing the task of washing dishes C.D. sloshed water on to the counters at which time Kathy Klaus yelled at him in front of staff and peers, threw a towel in his face and told him he to clean up his mess.

49.     District 212, in the form of Life Apartment Program Director Kathy Klaus, showed aggressive and abusive behavior towards C.D. on Tuesday September 27, 2011. Unintentionally on C.D.'s part he took a piece of pizza before an existing student, who was leaving the program, was served first. In an uncontrollable fit of anger District 212 Director intentionally became abusive in front of staff, peers and visitors by imitating C.D. in a whiny voice and prancing around citing characteristic of his disability that was frustrating her and the staff. This caused irreversible emotional damage to C.D. and caused him to feel alienated from his peers and alone in the program. His ability to socialize in the program carried over to home and C.D. became reclusive. Only coming out of his room to eat and attend school.

Plaintiffs had to stop attending some family functions and outdoor activities as he would become distressed in social situations where he was expected to interact.

50.     During school year 2011-2012, District 212 Violated IEP 3/18/11 which called for 90 minutes direct Social services by admitting no direct Social Work minutes were given. C.D.'s behavior and problems with staff at the Life Program were a bi-weekly occurrence. Ms. Nardella was called 2-3 times a week to mediate between Kathy Klaus and her son. Once C.D. called his mother to pick him up and she found him walking across the street from the program in fringed weather with no coat or supervision.

51.     C.D.'s sister entered freshman year in Dist. 212 school year 2010/2011. She attended classes at the East Campus. In October 2010 she developed visual problems that worsened over the 1st semester. Into the 2nd semester her vision had not improved and she developed anxiety which caused panic attacks and migraine problems.

52.     Between January and April 2011, Ms. Nardella's daughter would call almost every day to ask permission to leave school. Most of the time Ms. Nardella would have to put her daughter's problems on hold as she would either be on the phone or at the District 212 Life Apartment dealing with C.D. and Kathy Klaus.

53.     Dist.212 personnel requested medical verification to implement a 504 plan for Ms. Nardella's daughter and requested a letter by her doctor explaining the migraines and visual problems. Also requested were test results being done at Loyola Medical Center. Parent Complied with the request and her physician recommended Dist. 212 work with plaintiffs in accommodating her needs. Dist.212 Both East and West Principles discussed our request for transfer to West campus where my daughter had peer support. Request was denied for 3 years and District personnel ignored the recommendation. 504 plan was never mentioned again.

54.     District 212 refusal to help these students caused both to be distrustful of administrators and C.D. was very distrustful of staff. Meetings where help was told to be coming and then ignored or refused by District 212 caused all plaintiffs undue suffering and emotional distress.

55.     District 212 called Ms. Nardella repeatedly with problems while C.D. was in their instructional programs to the point that Ms. Nardella could not gain meaningful employment because she would need to intervene in person or over the phone at a moment's notice at least twice to three times a week. It became so stressful Ms. Nardella had to drop from college with 2 classes left to graduate. Over 40 official IEP and unofficial meetings were held with the district from 8/2008 -2/2013. District 212 continued its pattern of denying appropriate psychological services and instructions, refusing to hold personnel accountable for their actions, provide any services or accommodations outside of academic instructions as mandated by law.

56.     District 212 Superintendent Kathrine Robbins agreed to attend IEP meeting 1/23/13 in a capacity of authority to authorize services and listen to Ms. Nardella's concerns about everything that had gone on since C.D. entered the Dist. 212 West Campus in 2008. Dr. Robbins had the authority and used said authority during this meeting in a deceptive manner to stop Ms. Nardella from filing due process at that time by agreeing to the requests/ demands Ms. Nardella made in regards to C.D.'s

Independent Evaluation, therapy and educational needs to help him deal with the abusive behavior of staff and the districts refusal of accommodations and related services for the previous 5 1/2 years.

57.     District 212. Intentionally and with full knowledge of the law tampered with official school records. Ms. Nardella requested all meetings held with District 212 starting with the IEP/Manifestation 1/23/13 meeting be audio recorded. The recordings and possession of the recorders were handled by Melinda McGuffin in every meeting held to discuss placement and related services from 1/23/13 to 2/6/13. On February 6, 2013 Dist. 212 personnel inquired if Ms. Nardella had listened to any of the tapes yet. Her reply was no. While preparing for the due process hearing Ms. Nardella listened to the tapes and learned all her copies made by Melinda McGuffin were tampered with and are in audible. Dist. 212 has repeatedly refused to give Ms. Nardella clear audible copies of these taped recordings. Last refusal was on 1/26/15 by Dana Crumley attorney for Dist.212

58.     District 212 in cooperation with LASEC TAS Nancy Coleman with forethought intentionally falsified records and tampered with the recording of meetings 1/23/13, 1/30/13, 2/4/13 and 2/6/13. Summaries of notes taken by Nancy Coleman during these meeting were transferred into the official IEPs. Inflammatory and defaming remarks were add to summaries and fabrications to outright lies were put into said IEPs.

59.     Hillside Academy in the form of Director Nancy Mutterer and Glen Oaks Therapeutic Day school in the form of Director Lisa Grigsby conspired with LASEC TAS and DISTRICT 212 to deceive and coerce Ms. Nardella and C.D. into Dist. 212 predetermined placement of Glen Oaks Therapeutic Day School. Dist. 212 purpose for placement in Glen Oaks was to insure control of a favorable evaluation report and the ability to have omitted any revelations during evaluations explaining C.D. emotional deterioration since entering District 212 programs and the causes for that deterioration.

60.     Dist.212 and Doctor Anna Hammond conspired to stop Ms. Nardella from having an independent Trauma assessment done to determine the causes of C.D. failing emotional health by an Independent Evaluator. Dr. Hammond informed Ms. Nardella that if she pursued the independent evaluation at that time they would stop the school evaluations and services. After Ms. Nardella agreed to hold off while Glen Oaks did evaluations, Dist. 212. personnel sent a letter stating they were no longer going to honor the agreements they made from 1/23/13 - 2/19/13. Independent evaluation was no longer being offered.

61.     Dist.212 purposely sent inflammatory and defaming information to Glen Oaks causing undue emotional harm to C.D. as this information caused staff and students to be afraid of him. C.D. was suspended twice due to this information and C.D. was unable to understand or cope emotionally with this placement. This was very apparent early into the placement by Lisa Grigsby, but C.D. was kept until the evaluation was completed under the supervision of Anna Hammond. He was immediately thrown out of the program after the completion of the evaluations.

62.     Report handed in by Dr. Anna Hammond was taken and interpreted from notes and testing by Thomas Kauffman. The report shows no outside services for social emotional issues and omits all recommendation Ms. Nardella was told by evaluator were present in several places of his report and findings of the cause of the emotional distress in C.D.

63.     Dr. Hammond refuses to give Ms. Nardella any of the observation notes and recommendation/conclusions made by her student for use in comparisons. Ms. Nardella was told by Dr. Hammond that schools do not give students the kind of services C.D. needed. Dr. Hammond refused to give any records to Ms. Nardella ignoring written requests.

64.     Dr. Hammond denied Ms. Nardella her right to see the psychological report before the 3/12/13 meeting stating it was not ready. The date on the report is 3/8/13. Ms. Nardella was not allowed to contact Thomas Kaufman to discuss this report and Glen Oaks refused to give contact information for him.

65.     LASEC case manager, Kathleen Cahill Sheridan, called Ms. Nardella on October 1, 2013 to discuss setting an IEP for 11/7/13 to implement a plan she was working on to transfer community involvement from Have Dreams to the Leyden area as part of C.D.'s transitional education. Being part of your community is essential for Transitional Services to be beneficial, especially for an individual with Autism. Being able to independently navigate and feel comfortable in your community is the only way to become employable and feel productive. After 9 months of being lied to by District 212 to uphold the agreements made, Ms. Nardella went in person to hand in written request for due process. After that no work was done to meet the goal of transferring community integration to Leyden.

### COUNT I

### THE IHO'S DECISSION SHOULD BE OVERTURNED

### BECAUSE THE IHO MISAPPLIED IMPORTANT IDEA STANDARDS

66.     Plaintiff's repeat and reallege Paragraphs 1 through 65 and incorporate them herein by reference.

67.     The IHO erroneously applied his decision in this case by misunderstanding the student's disability. C.D. has Autism not Asperger's Syndrome. Although both disabilities have common characteristics they are completely different in their core impediment and learning techniques. By applying the evidence to the wrong disability the IHO erroneously determined that the student had made more than de minimis progress in his transitional program concluding that District 212 had provided C.D.'s FAPE.

68.     Despite consistent testimony and documentation that C.D. had not made progress in social/emotional behavior and in fact had digressed, Causing unemployable social skills, the IHO ignored objective documentation in favor of subjective and self-serving statement and documentation of District personnel at the hearing, after the fact, that C.D. had made progress in District programs.

69.     Pursuant to the IDEA, the measurable goals and objectives in the IEP of a student with a disability are the "modus operandi", or basis of the student's special education. By ignoring C.D.'s inability to understand the verbal instructions by untrained staff as the proper social behavior while the visual behavior expressed by staff was completely the opposite, the IHO incorrectly reduced C.D.'s IEP from the penultimate document described in the IDEA to a meaningless piece of paper.

70.     The IHO found that C.D.'s mother had meaningfully participated in discussions regarding his special education although District personnel considered the parent a constant complainer and disregarded her input for several years. District personnel regularly came to agreements in meetings

when Ms. Nardella was present to placate her and then proceeded to make the decision to ignore the agreements as soon as the meetings were over.

71.     By this ruling, the IHO reduced the IDEAs procedural requirement of "meaningful participation" to meaningless participation, and ignored federal and state law requirements that districts review evaluations with parents and discuss any changes to IEP before changes are made.

72.     The IHO misinterpreted and misapplied the standard of meaningful and beneficial progress by elevating the importance of the 8 months of an appropriate program and 3 months of psychological services to be greater than the right to FAPE for 6 and 1/2 years

WHEREFORE, Plaintiffs respectfully request that this Court:

1)     Receive and review the record of the administrative proceedings below from

       Illinois State Board of Education;

2)     Supplement the record and hear additional evidence from Ms. Nardella,

       As the Court deems appropriate;

3)     Overturn the IHO'S Decision and Order;

4)     Order the District to assume full financial responsibility for C.D.'s

       Placement at Elmhurst Learning and Success Academy, a private educational

       facility with a special education certificate program and related clinical and

       Transportation expenses;

5)     Order the District to reimburse plaintiff for related services C.D. is currently
       receiving;

6)     Order the District to reimburse plaintiff for prior legal fees and cost from
       Original due process;

7)     Award Plaintiffs reasonable attorney fee; and

8)     Order any relief in favor of Plaintiffs that this Court deems just.

## COUNT II

### THE IHO'S DECISION AND ORDER MUST BE OVERTURNED

### DUE TO SIGNIFICANT ERRONEOUS PROCEDURAL RULINGS

73.     Plaintiffs repeat and reallege Paragraphs 1 through 72 and incorporate herein by reference.

74.    The United States Supreme Court held that the moving party in an IDEA due process hearing has the burden of proof and that parents should have equal access to the school's information related to the student with a disability.

75.    In contravention of this Supreme Court decision, IHO refused to rule on Ms. Nardella's repeated request for C.D.'s complete school records. Records that included untampered audio tapes, psychological observation and notes, official records released by District 212 to Glen Oaks, thereby preventing Ms. Nardella from obtaining information needed to present her case. This evidence was relevant to the case because it shows the Districts pattern and practice of denying services and defaming the plaintiff's to avoid responsibility. The evidence also shows the District practice of covering up the erroneous mistakes the District made in C.D.'s education by blaming the parent and student.

76.    Before the hearing and before any testimony was given, the IHO excluded the parents right to file a complete due process counter complaint to include the history of the nature of the problem. Instead the IHO instructed the parent to hand in a shortened complaint only to include certain defined points required to show denial of FAPE. This evidence was relevant in showing C.D.'s problems and behaviors including the behavior of District personnel. The background history to the complaint was relevant to the IHO's understanding of the case before him.

77.    Before the hearing and before any testimony was given, the IHO denied parents request for 2 year time frame to be pushed back ignoring evidence that parent had been lied to by the District on several occasions to stop her from filing due process prior to the date IHO states parent requested permission to file.

78    The IHO requested a brake in the middle of parent's testimony and then asked that District personnel be allowed to testify before parent resumed her testimony. Ms. Nardella's concentration caused her to fail to mention certain aspect that were critical to their case.

79.    The IHO's multiple rulings improperly limited the scope of evidence at the hearing for the plaintiffs while allowing the district to enter into evidence testimony outside the limited scope to the detriment of C.D. and his parent.

WHEREFORE, Plaintiffs respectfully request that this Court:

1)    Receive and review the record of the administrative proceedings below from Illinois State Board of Education;

2)    Supplement the record and hear additional evidence from Ms. Nardella, As the Court deems appropriate;

3)    Overturn the IHO'S Decision and Order;

4)    Order the District to assume full financial responsibility for C.D.'s Placement at Elmhurst Learning and Success Academy, a private educational facility with a special education certificate program and related clinical and Transportation expenses;

5) Order the District to reimburse plaintiff for related services C.D. is currently receiving;

6) Order the District to reimburse plaintiff for prior legal fees and cost from Original due process;

7) Award Plaintiffs reasonable attorney fee; and

8) Order any relief in favor of Plaintiffs that this Court deems just.

## COUNT III

### THE IHO'S DECISION AND ORDER SHOULD BE OVERTURNED

### BECAUSE THE IHO INCORRECTLY BLAMED THE

### STUDENT FOR THE DISTRICT'S FAILURE TO PROVIDE FAPE.

**80.** Plaintiffs repeat and reallege Paragraphs 1 through 79 and incorporate them herein by reference.

81. The IHO blamed C.D for his lack of related services by erroneously believing that he was capable of asking for the help his self. The IHO ignored the uncontested testimony that Ms. Nardella speaking on C.D.'s behalf had requested individual and increased social services for years and was constantly denied.

82. The IHO concluded that C.D should have been responsible for requesting help from personnel who continually behaved in a manner that caused him great pain and emotional distress, instead of the District providing the appropriate related services C.D. had a right to receive without personally having to ask for them under FAPE.

83. The IHO illegally held C.D. responsible for his FAPE, rather than holding District 212 responsible for providing FAPE.

WHEREFORE, Plaintiffs respectfully request that this Court:

1) Receive and review the record of the administrative proceedings below from Illinois State Board of Education;

2) Supplement the record and hear additional evidence from Ms. Nardella, As the Court deems appropriate;

3) Overturn the IHO'S Decision and Order;

4) Order the District to assume full financial responsibility for C.D.'s Placement at Elmhurst Learning and Success Academy, a private educational facility with a special education certificate program and related clinical and Transportation expenses;

5) Order the District to reimburse plaintiff for related services C.D. is currently receiving;

6) Order the District to reimburse plaintiff for prior legal fees and cost from Original due process;

7) Award Plaintiffs reasonable attorney fee; and

8) Order any relief in favor of Plaintiffs that this Court deems just.

## COUNT IV

### THE IHO'S DECISION AND ORDER SHOULD BE OVERTURNED

### DUE TO FINDINGS OF FACT THAT WERE CLEARLY ERRONEOUS

84. Plaintiffs repeat and reallege Paragraphs 1 through 83 and incorporate them herein by reference.

**85.** The IHO based the facts of the case on a student with Asperger's Syndrome instead of applying them to a student with Autism, thereby erroneously concluding that progress was made in C.D. educational program when no progress (but actual noticeable digression) in the area of social interactions which is the core impediment in Autistic individuals to the detriment of plaintiff's case. Ms. Nardella has been and still is C.D. primary care giver. In her role she is very knowledgeable in Autism and was President of the Autism Society of America's Chicago Chapter for 6 years from 1996 – 2002. Ms. Nardella has never referred to C.D. as Asperger's.

86. The IHO's refusal for back ground history on the District falsifying IEPs along with the IHO's refusing to allow prior IEPs to be put into evidence caused the IHO to make several assumption about C.D.'s progress and benefit from the District programs that were not there.

87. The IHO going by false statements and supposed facts the District put in its paperwork unintentionally concluded that a continuum of services had been given to C.D. The fact is no services were given between C.D.'s dismissal from Glen Oaks and his placement 5 weeks later in Have Dreams. The District wanted to give services between 5:30 and 6:30 p.m. at a time when C.D. is in a nightly routine. District personnel stated they had the right under law to decide that 1 hour a day was sufficient under FAPE and what time of day that hour of educational services would start even though 5:30 p.m. is 3 hours past the end of a regular school day. Plaintiffs felt this disruption at this late in the day would be more harmful the educationally beneficial.

88. The IHO going only on testimony by the District concluded that C.D.'s problems came to a complete and abrupt halt when he entered the District Transition Apartment. Ms. Nardella was not allowed to dispute this testimony. In complete contrast to the IHO's findings, C.D. had the same exact problems with this program on a bi-weekly basis and his ability to cope with harassing District personnel without services and changes in their behavior was becoming and did become critical.

89. The IHO found that C.D. had no major emotional incidents once in Have Dreams is contradictory to testimony from Tom Dempsey. The IHO was mistaken in his perception of the clinical psychological services provided at Have Dreams. The services in this statement consisted of 8 individual

session starting in December of 2013 when C.D. had only 2 months left before he aged out of public education. C.D. did not have these services while at Have Dreams from April to December/ 2013.

90.     The IHO's finding for Emotional Trauma is clearly erroneous as the plaintiffs were not allowed to testify or place into evidence any allegations of the abuse by personnel and the actions that caused the Emotional Trauma by District 212, District 212 Life Transition and Glen Oaks.

91.     The IHO's findings that C.D. is employable solely on the testimony of District's witness and not by the whole of internship and work related performances throughout this aspect of C.D.'s education is mistaken. The IHO lacked the knowledge of how Autistic individual's social understanding and behavior affect the individual's capability of becoming employed.

WHEREFORE, Plaintiffs respectfully request that this Court:

1)     Receive and review the record of the administrative proceedings below from Illinois State Board of Education;

2)     Supplement the record and hear additional evidence from Ms. Nardella, As the Court deems appropriate;

3)     Overturn the IHO'S Decision and Order;

4)     Order the District to assume full financial responsibility for C.D.'s Placement at Elmhurst Learning and Success Academy, a private educational facility with a special education certificate program and related clinical and Transportation expenses;

5)     Order the District to reimburse plaintiff for related services C.D. is currently receiving;

6)     Order the District to reimburse plaintiff for prior legal fees and cost from Original due process;

7)     Award Plaintiffs reasonable attorney fee; and

8)     Order any relief in favor of Plaintiffs that this Court deems just.


**COUNT V**

**THE IHO'S DECISION AND ORDER SHOULD BE OVERTURNED**

**DUE TO IMPROPRIETIES COMMITTED BY THE**

**IHO THAT UNDERMIND HIS IMPARTIALITY**

92.     Plaintiffs repeat and reallege Paragraphs 1 through 91 and incorporate them herein by reference.

93.     Before the hearing and before any testimony was given, The IHO repeatedly informed plaintiff personally and through her attorney that allegations of abuse by District personnel was not in his authority to rule on and had no bearing in an educational due process case . Ms. Nardella was repeatedly told she could not testify to any allegations of abuse but the IHO allowed the district personnel to testify there was no abuse and ruled no abuse was evident.

94.     Before the hearing and before any testimony was given, the IHO and all parties discussed the mention of Sandy Hook by District 212 in its account of incident on 1/8/13. Ms. Nardella stated District 212 made the reference only to defame C.D. and make it appear his disability was on a course as that of the Sandy Hook shooter. The fact that District personnel had to admit **they never heard** Sandy Hook mentioned either by C.D. or his mother did not stop the IHO stating C.D. referenced Sandy Hook.

95.     During testimony, the IHO permitted District witnesses to testify to certain subjects that the IHO did not allow the plaintiff or its witnesses to testify too. The IHO also allowed District witnesses to testify and give evidence to instances outside the scope and time line of complaint.

96.     The IHO allowed the District to testify and enter into the IHO's binder personnel attacks against Ms. Nardella while plaintiff was only allowed to state facts to prove her claim of denying FAPE and was not allowed to testify to the District staffs behaviors and attitude. Ms. Nardella's angry behavior (as a parent of a child who tried to stab his self just to get out of the Districts program) was more than justifiable after 5 years of asking and pleading for services and had no bearing on the case. There is no exception in IDEA that allows denial of FAPE if you don't like the parent.

97.     The IHO made the plaintiff's present their case first and refused to allow Ms. Nardella her right to testify after the District presented to refute the testimony given by district personnel.  The IHO ignored Ms. Nardella's request that he listen to audio taped evidence in the districts procession to refute District testimony referencing he wasn't going to take the time. IHO stated there was nothing Ms. Nardella could say that would change his mind on the case. This was before the District was allowed to show video of C.D. after the fact and before closing arguments were presented.

98.     The various improprieties committed by the IHO, demonstrate that the IHO was not impartial.

WHEREFORE, Plaintiffs respectfully request that this Court:

1)      Receive and review the record of the administrative proceedings below from

        Illinois State Board of Education;

2)      Supplement the record and hear additional evidence from Ms. Nardella,

        As the Court deems appropriate;

3)      Overturn the IHO'S Decision and Order;

4)      Order the District to assume full financial responsibility for C.D.'s

Placement at Elmhurst Learning and Success Academy, a private educational

Facility with a special education certificate program and related clinical and

Transportation expenses;

5) Order the District to reimburse plaintiff for related services C.D. is currently receiving;

6) Order the District to reimburse plaintiff for prior legal fees and cost from Original due process;

7) Award Plaintiffs reasonable attorney fee; and

8) Order any relief in favor of Plaintiffs that this Court deems just.

## COUNT VI

### THE COURT SHOULD AWARD DAMAGES TO THE PLAINTIFFS FOR THEIR PAIN AND SUFFERING

### WHICH WAS DIRECTLY CAUSED BY THE DEFENDANT'S CONSPRIRING

### TO VIOLATE PLAINTIFFS'S CIVIL RIGHTS

99.     Plaintiffs repeat and reallege Paragraphs 1 through 98 and incorporate them herein by reference.

BACK GROUND TO COMPLAINT COUNT VI

100.     Being the parent of a special needs child, especially a child with high functioning Autism, I was aware there would be problems for my son when he entered high school. In preparation for this I started talks with District 212 eight months before the 2007 school year. I went into great detail explaining my son's disability, characteristics in his behavior and problems with sensory issues in hopes of avoiding stress as he transitioned from middle school into West Leyden High School.

As it got closer to the start of school I called a meeting with Dist.212 special ed. director and the special education councilor as no one from the district had gotten back to me on requests for accommodations. At this meeting I was told that my son was functioning enough that he would need to learn how to adapt to the real world without accommodations so accommodations were denied.  This started a pattern of denial by District 212 to accommodate my son's special/ social/emotional needs, and a pattern of District 212 agreeing to accommodations to placate me when I was in meetings with them and then not following through with accommodations or stopping them with no warning after a couple days.

Almost immediately my son had problems due to his disability and the refusals that made freshman year extremely stressful and humiliating for him. On the pretense of fixing their mistakes, a meeting was held June 3, 2008. District 212 personnel stated they were now more aware of the problems C.D. was having and a plan of accommodations would go into effect at the start of sophomore year.

Sophomore year started with my complaining to Director of Special Ed. Melinda McGuffin about her ignoring my calls and e-mails over the summer for information on accommodations from IEP 6/3/08. Ms. McGuffin informed me she had a busy summer and didn't have time to answer calls or emails from me. Shortly after I complained to Ms. McGuffin I received a call from District transportation accusing me of taken my son to an empty house we no longer live in so he could receive transportation to school. The school was informed over the summer that we would be moving to the East Campus side of the district on October 1st (2008) either way we were still in district 212 and special education is taught at the West Campus. Ms. McGuffin insisted on a meeting to discuss transportation stating they had a right to deny transportation and make me drive him to school. This statement and harassment was made with full knowledge of the by Ms. McGuffin of the Districts policy allowing students who move to the other side of the boundaries with in the district to remain enrolled in the campus they started in.

This started a 5 year pattern of district 212 administration and personnel ignoring my children's needs based on their attitude towards me. During this same time frame my son started to have problems with a few teachers over behavior on both sides. Meetings were called to discuss what triggered the behavior and how to avoid these confrontations. I constantly had to remind those in attendance that although my son was very high functioning, he still had a disability that they forget to make part of the equation. District 212, having undertrained staff with little knowledge of Autism continually with full knowledge ( and some with malicious forethought) of reactions by my son, repeated the same triggers causing the behavior to worsen and his emotional health to deteriorate as he could not cope with personnel's behavior and attitudes.

Plaintiffs further alleges as follows;

a)     On 1/8/13 my son tried to harm himself while in the District Transition Apartment. Feeling the abusive environment in District 212 would never end no matter what he did to please them and perceiving this treatment as owed him for his inadequate social understanding caused by his Autism. My son felt this was his only option to get away from District 212's program.

b)     District 212 personnel with forethought and malicious intent started an illegal campaign to defame and deceive us in an attempt to cover up their handling of my son's case. They stared this campaign by inserting the rumor that my son was relating to the Sandy Hook Shooter (believed to be on the Autism Spectrum) and his behavior was a manifestation of Autism and not denial of FAPE and staff behavior.

c)     Prior to a meeting held on 1/23/13 I requested District Superintendent Kathleen Robbins attend this meeting and all meetings pertaining to my son's education were to be audio taped from now on for honesty as the district personnel continually lied about actions and services. At this time District 212 Administration along with LASEC TAS Nancy Coleman knowingly, willfully and intentionally conspired to tamper with and falsify evidence and school records. District 212 also knowing, willfully, intentionally and maliciously deceived us by agreeing to my demands for services and appropriate placement, to include trauma assessment for mental health, to resolve the matter so I would not file due process.

d)     Hillside Academy and Glen Oaks personnel knowingly and intentionally conspired to violate my son's civil rights and failed to intervene to protect him from violation of civil rights by

LASEC and District 212 in their attempt to coerce us into a predetermined placement program run by Glen Oaks against our expressed wishes. On 1/29/13 Hillside Academy agreed to give a full facility tour to include program operations for our consideration. Hillside Academy was well aware of the fact that this was for immediate placement and only their Hillside location was being considered. This tour took over 1 ½ hours as I explained my son's situation and emotional state in great detail. Personnel were well aware of the fact that this facility was not running any programs at this time and placement there was never an option to us. Two days later on 1/31/13 facts about Glen Oaks program obtained during a candidacy tour at their facility in Glen Ellyn led me to believe this placement was not appropriate for my son's needs. I again went into great detail explaining my son's situation and emotional state. Not only did my son not fit the criteria (among other things) to be enrolled in this program, he fit the criteria of students not admitted into this program. Lisa Grigsby and I mutually agreed to this fact before my son and I left. I discussed both places with my son and we decided Hillside would be perfect. I called Nancy Coleman the next day (Friday) and told her of our choice. A meeting was set for Monday the 4th of February. I was told at this meeting that Hillside would not accept my son because they could not run a program for just one student. I refuse Glen Oaks as a placement. Melinda McGuffin stated there were no other programs available and phone conferenced Lisa Grigsby into the meeting. Ms. Grigsby proceed to state that Melinda had completely filled her in on my son's problems and behaviors and she was confident there would be no problems if he was placed in Glen Oaks that they could handle his needs. This predetermined placement was to insure control over psychological evaluation and assessment being administered under Dr. Hammond.

e)      Melinda McGuffin with malice and forethought described my son to Glen Oaks in a way that made staff and peers afraid of him. I received a call from Lisa Grigsby on Thursday 2/21/13 ten days after my son started their program. Lisa Grigsby informed me that my son was suspended the next day for behavior that was frightening staff and students. She suggested I get immediate help for my son and she didn't think my son should return to Glen Oaks. Lisa Grigsby wrote a statement stating my son's problems were beyond the scope of Glen Oaks program and he needs could not be met there. Lisa Grigsby called the next day and stated my son was to return to their program the following Monday 2/25/13. This was done to keep my son in their program until evaluations could be completed.

f)      Glen Oaks Director Lisa Grigsby refused my request to view all records they had on my son to include any and all information sent to them by District 212. My son was suspended twice in a two week period by Glen Oaks. One suspension accused my son of physically assaulting a female student during a community outing. When I asked to accompany them to the store to see security tape of the incident, Glen Oaks admitted it never happened and changed their paperwork. Yet due to the other students unfounded fear of my son he was no longer allowed on the outings or in group.

g)      On the same day as stated in (e) 2/21/13 Dr. Hammond and District 212 conspired to stop us from having an independent trauma assessment done by stating they would stop all evaluation and assessments being done by them if we did not agree to postpone independent assessment for 6 months. Hours after I agreed to Dr. Hammond's ultimatum to hold off on the independent evaluation, District 212 sent me a letter stating they would no longer take

responsibility for their actions as they agreed on 1/23/13. New evidence obtained by them relieved them of any responsibility for my son's issues. I was also told we were given a new case manager from LASEC and I was to go through them and not contact the district any longer concerning my son's education.

h)      Thomas Kaufman acted knowingly when he failed to intervene to protect my son's civil rights allowing his report on my son's trauma and recommendation for therapy to be altered before being put on record by Dr. Hammond.  Unsubstantiated comments and false statement attributed to us were also added to this report to further favor District 212.

i)      I contacted Dr. Hammond's supervisor and administrators with Adventist Christ Hospital informing them in great detail about my son's emotional health at the time and the need for therapy. I expressly told them of Dr. Hammond handed in a report that did not reflect the information and recommendations I was given by Mr. Kaufman and the inaccuracies included in the report. I relayed Dr. Hammond's statement that schools do supply the intensive therapy recommended by Mr. Kaufman that my son needed and I should find help in the private sector. Explaining that the school agreed to therapy based on the assessment made by Mr. Kaufman and it wasn't Dr. Hammond's job to worry about the district having to supply the services.  I also stated that medical professionals have a duty to the patience and not the institution paying the evaluation. Although they admitted the report involved contradictory statements and facts they refused any intervention and denied us the notes and observation used to determine the content that went into the report.

j)      District 212 personnel knowingly, intentionally, willfully and with malice filed a false police report on Ms. Nardella with the Northlake Police Department and threatened to press charges against her on 7/1/13 to cover up yet another instance of insubordination by their transportation department and to defame Ms. Nardella. Dist.212 personnel left C.D. at his Evanston placement without transportation home on 6/28/13. When Ms. Nardella called for the reason, District 212 personnel told her it was none of her business and they did not have to give her any information. Ms. Nardella preceded to call the school principle and left a message and then contacted the board president giving him details about the situation. Dist. 212 personnel called Ms. Nardella back approximately 6:25 p.m. on June 28th, 2013 calling her a liar and stating C.D. should arrive home shortly.  C.D. regularly returned home by 3:25.

All the defendants in this case with full knowledge of their actions acted knowingly, intentionally, willfully and maliciously to some degree in a conspiracy to violate my children's civil rights. District 212's main concern at this time was not the education of my son. They were not concerned for his mental health. District 212 sole objective at this time was to cover up their mishandling of my son's case and the trauma they caused him. My daughter ended up suffering due to guilt by association. With intentional malice and forethought District 212 set out to harm and defame my family in an attempt to stop us from having any evidence that might prove liability against them in a court of law.

As a result of defendant's intentionally malicious conduct, my family and I suffered extreme emotional pain and suffering. My son went from being a happy, socially interactive

Life Apartment so he wouldn't have to go any longer. My son spends 18 hours a day in his room. We no longer join extended family at bi yearly functions as my son becomes distressed.

While in District 212 instructional programs my daughter received honor grades and did well in all her classes. The problems with her vision and Dist.212 refusal for any help caused her to withdraw from her friends and peers. She no longer socialized in or out of school and stopped engaging in any social activities. My daughter spent her lunch time alone in the bathrooms reading to avoid possible anxiety and panic attacks. My daughter was a bright and popular young lady before entering into District 212. My relationship with her suffered immensely through high school as most times her problems had to be put on the back burner as I was busy dealing with the district on my son's problems. Our relationship was at its most bottom between sophomore and junior years (2011 to 13) when I denied her begging and pleading with me to sign over my parental rights to her best friend's parents who lived inside the West Campus boundaries. While being a single parent and trying to better our situation I was forced to drop out of college as the emotional toll on my family caused difficulty in my ability to retain subject matter. I was an honor student with a 3.78 GPA and 2 credit courses away from graduating. Gaining meaningful employment was not an option because I received 3/5 calls per week to intervene for my children with the district. Most times having to physically show up to bring them home.

There is little doubt that the harm suffered by my family exceeded a mere denial of FAPE. The cumulative impact ... supports a reasonable inference that defendants acted in a cooperative measure to assist District 212 in violating civil rights while fully informed of the emotional trauma my son was suffering with no regard as to the harm their actions would have on our family. As a result of defendant's conduct, my children and I suffered greatly.

The Dependents, all business partners, entered willfully into a conspiracy to violate rights protected by Illinois law and the IDEA such as conspiracy and/or any other claims that may be supported by the allegations of this complaint.

WHEREFORE, Plaintiffs respectfully request the following relief:

1) Damages to compensate for all bodily harm, emotional harm, pain and suffering, loss of income, loss of enjoyment of life, and any other injuries inflicted by defendants

3) Punitive damages in the amounts as follows against individual defendants

| | |
|---|---|
| A) BOE for District 212 | $5,710,000 |
| B) LASEC | $3,500,000 |
| C) Dr. Kathrine Robbins | $350,000 |
| D) Melinda McGuffin | $500,000 |
| E) Nancy Coleman | $500,000 |
| F) Hillside Academy | $350,000 |

| | |
|---|---|
| G) Dr. Lynne Nicholas | $350,000 |
| H) Nancy Mutterer | $350,000 |
| I) Glen Oaks Therapeutic Day School | $350,000 |
| J) Glen Oaks Adventist Christ Hospital | $3,500,000 |
| K) Thomas Kaufman | $ 350,000 |
| L) Lisa Grigsby | $ 500,000 |
| M) Dr. Anna Hammond | $ 1,000,000 |

4)  Such injunctive, declaratory, or other relief as may be appropriate, including attorney's fees and reasonable expenses as authorized by 42 U.S.C. §1988

5)  Order all relief in favor of Plaintiffs that this Court deems just.

*Cynthia Nardella*

Cynthia Nardella

2522 Silvercreek Drive

Franklin Park, Ill. 60131

(847) 451-9453

## ILLINOIS STATE BOARD OF EDUCATION
## IMPARTIAL DUE PROCESS HEARING

---

**C.D.,**

      Student,

v.

                                       Case No. 2014-0230

**LEYDEN TOWNSHIP HIGH SCHOOL
DISTRICT No. 212,**

            School District.                  Philip C. Milsk,
                                          Impartial Hearing Officer

---

## FINAL DECISION AND ORDER

### BACKGROUND

C.D. is a well-liked and intelligent young man with high-functioning autism (also known as Asperger's Syndrome). C.D.'s eligibility for special education under the federal Individuals with Disabilities Education Act ("IDEA") and the Illinois School Code terminated on his twenty-second birthday, March 5, 2014. The issues in the case are set forth below.

This case was initiated on November 22, 2013, when the School District ("District"), by its counsel, submitted a request for a due process hearing following a request for an independent educational evaluation ("IEE") by C.D.'s mother, C.N. ("Parent"). See, 34 C.F.R. 300.502(b)(2)(i). This hearing officer was assigned to the case on November 22, 2014. Parent and C.D. were not represented by counsel at the time, although Parent had a non-lawyer advocate assist her briefly, and the advocate participated in on one status conference call early in the case. Resolution efforts were unsuccessful, and a State Board of Education-sponsored Mediation session held on February 3, 2014, failed to resolve the dispute.

During a status conference call on February 21, 2014, Parent stated that she wanted to file her own hearing request and counter-complaint raising additional issues. She was given fourteen days to file her counter-complaint. The counter-complaint was filed by the Parent on March 5, 2014, by e-mail. On March 8, 2014, an Order was entered re-starting the timelines in the case because the Parent's counter-complaint raised new issues.

On March 18, 2014, the District filed a Motion to Dismiss challenging the sufficiency of the Parent's complaint pursuant to 20 U.S.C. 1415 (c)(2)(A). After carefully reviewing the complaint and the District's Motion, and taking into consideration that the Parent and Student were not represented by counsel at the time, this hearing officer

determined that some of the allegations made by the Parent were adequate to survive the District's challenge, but needed further clarification. Accordingly, on March 24, 2014, an Order was entered giving the Parent an additional fourteen days to provide additional details with respect to three of her issues. (Subsequently the Parent was allowed five additional days at her request.)

On April 11, 2014, the Parent filed her addendum to the counter-complaint. The District was given ten days to file a response and fifteen days to file a sufficiency challenge in accordance with applicable procedures under IDEA.

The District filed a Motion to Dismiss for lack of sufficiency on April 25, 2014. After reviewing the Parent's addendum, the District's Motion, and an e-mail message from the Parent dated April 25, 2014, responding to the District's Motion, this hearing officer entered an Order on May 10, 2014, defining the issues that were properly raised by the Parent with respect to alleged violations that occurred on or after March 5, 2012, within the two-year Statute of Limitations as set forth in IDEA. 20 U.S.C. 1415(b)(6); 34 C.F.R. 300.507 (a)(2).

After a number of status conference calls and continued efforts to resolve this matter, Parent retained counsel in July, 2014. The Pre-hearing Conference was held on August 18, 2014, with counsel for the parties. A Pre-hearing Report and Order was issued immediately following the Pre-hearing Conference.

Settlement discussions were held after the Pre-hearing Conference. On or about October 6, 2014, this hearing officer was informed by counsel that a settlement had been reached. However, three weeks later during a status conference call, counsel reported that the settlement had fallen apart and the matter would be going to hearing.

The due process hearing concerning was held at East Leyden High School in Franklin Park, Illinois on January 26 and 27, 2015. This was a closed hearing. C.D. was not present at the hearing, but gave testimony by speaker phone. Parent was present throughout the hearing. District representatives were Amy Ramsey, Director of Special Education for the District's high schools, and Melinda McGuffin, Director of the Leyden Area Special Education Cooperative. A list of hearing participants and witnesses is provided in Appendix I.

## JURISDICTION

This hearing officer has jurisdiction under 20 U.S.C. 1415, 34 C.F.R. 300.507, and 105 ILCS 5/14-8.02a.

## ISSUES

1.  Should the District provide an independent educational evaluation ("IEE") of C.D. as a compensatory service to determine his social, emotional, behavioral and/or post-secondary transition needs?

2.  Should the District provide compensatory services to C.D. to address his social, emotional, and behavioral needs?

3.  Should the District provide compensatory services to C.D. to address his post-secondary transition life skills?

## FINDINGS OF FACT

After considering the evidence and arguments of counsel, this hearing officer makes the following findings of fact:

1.  ### C.D.'s Strengths
    C.D. is a 22 year-old man with autism who will turn 23 on March 5, 2015. C.D. functions at the high end of the autism spectrum and has what is commonly known as Asperger's Syndrome. (Testimony of Parent). C.D. has many strengths. He is bright and articulate with a sound general knowledge base and a good sense of humor. He is employable and has ambitions. (Testimony of Tom Dempsey). His IEPs indicate that he has strong writing skills. He is physically active, understands the importance of physical fitness (Exhibits, p. 276 under "Student Strengths"), participated in Special Olympics track and field, and became a team leader. (Testimony of Caryn Hart). C.D. has friends and family who care very much about him and are concerned about his welfare. (Testimony of Parent, Danny Leola, Nora Prendergast and Brittany Mescolotto).

2.  ### C.D.'s Post-secondary Transition Needs
    C.D. has deficiencies in the areas of social interaction, social understanding, and obsessive and compulsive thoughts and behaviors. (Testimony of Parent). He does well with structure, but is challenged when he is outside of his routine. (Testimony of Tom Dempsey). Changes in schedule or routine cause him significant frustration. (Testimony of Dempsey). He needs to learn how to cope with frustration and problem solving that trigger emotional responses. (Exhibits, p. 162). On a job site he has may have difficulty when he is given a direction or asked to take corrective action that he does not agree with. (Exhibits, p. 239— statement of Roger Reiner, his Walgreens job coach at LIFE Transition Center). There is nothing in the record indicating that C.D. is violent or aggressive by nature. It appears that he often becomes frustrated with himself in certain situations and needs help to talk through his frustrations, feelings and responses. (Testimony of C.D.)

3.  ### C.D.'s Relevant Educational History

C.D. attended high school in the District for four consecutive years beginning in the 2007-08 school year. His class graduated in 2011. During the 2011-12 school year his eligibility for special education transition services continued and he participated in the District's post-secondary transition program at ithe LIFE Transition Center.

His placement at the LIFE Transition Center was terminated after an incident involving a knife ("knife incident") on January 8, 2013. This was preceded by an incident before the holiday break in December, 2012, when C.D. became upset because the other students did not want to watch a movie that he had chosen, and he allegedly stated that he wished he had a gun and allegedly made a reference to the Sandy Hook School shootings that had just occurred about a week before in Connecticut. A Manifestation Determination Review process pursuant to 20 U.S.C. 1415(k)(1)(E) was commenced by the District following the knife incident. (See, Exhibits, p. 336). The official determination of the IEP Team was that the knife incident was not a manifestation of C.D.'s disability, but only to placate the Parent after a series of contentious meetings in early 2013. (Testimony of Melinda McGuffin). It was clear from the testimony of Amy Ramsey and McGuffin that the IEP Team had actually determined that the conduct was a manifestation of C.D.'s disability.

He was then placed in a therapeutic program at the Glen Oaks Transition Program from February 6, 2013, until March 14, 2013. His participation at Glen Oaks was discontinued by Glen Oaks following several behavioral incidents and a determination by Glen Oaks that it could not meet his needs. (Exhibits, p. 321, letter to Parent). It is not clear whether Glen Oaks was intended to be a 45-day alternative educational setting under 20 U.S.C. 1415(k). From the testimony of various witnesses including school personnel and the Parent, it appears that if things had worked out for C.D. at Glen Oaks he probably would have continued there.

After leaving Glen Oaks C.D. received homebound services from the District beginning on March 15, 2013, while the district looked into other placement options. (Exhibits, p. 210). He entered the Have Dreams program in Evanston, Illinois on April 23, 2013, and he continued at Have Dreams until his eligibility terminated on March 4, 2014, the day before his 22nd birthday. (105 ILCS 5/14-1.02)

C.D. is currently taking online courses through Triton Community College. (Testimony of C.D.).

4.     *Vocational and Life Skills*
The program offered by the District for C.D. in regard to vocational and life skills included training and activities to develop vocational and independent living skills such as work experience, self-advocacy, personal finance, shopping, and

domestic skills such as cleaning and cooking. He participated in Special Olympics track and field as a sprinter and became a team leader. District staff assisted him in his effort to obtain SSI benefits. (Testimony of Caryn Hart). At LIFE Transition Center he worked with a job coach at a Dollar Store and then at a Walgreen's. (Testimony of Caryn Hart and Amy Ramsey). At Have Dreams he worked at another Walgreens, a bakery and did some online work for Infinitech. (Testimony of C.D. and Tom Dempsey). He especially enjoyed his work at the bakery.(Testimony of C.D.)  There is nothing in the record to show that the vocational and transitional life skills components of C.D.'s transition program were inappropriate or inadequate after March 5, 2012.

### *Services for Social, Emotional and Behavioral Needs*
The District provided school social work services for C.D. throughout his four years of high school. Tom Trousdale, LCSW, was his social worker. Mr. Trousdale provided 25 minutes per month of social work services to C.D. in his freshman and sophomore years, and 60 minutes per month in his third and fourth years until the minutes were increased to 90 minutes per month in March 2011.  The increase in minutes was an IEP team decision and Mr. Trousdale was not aware of the reason for the increase. C.D. was able to ask for additional help if needed. Most of the services provided by Mr. Trousdale were in small groups of 4-6 students. Mr. Trousdale testified that he did not recall any instance in which C.D. asked for additional services. The groups worked on social communication. Mr. Trousdale attended a training program on serving students with autism after C.D. had exited the high school.

C.D. received no individual social work sessions his first year at the LIFE Transition Center. (Testimony of Parent).  He took medication related to his emotional and behavioral needs during the first year. He had a very good year, with less edginess and more enthusiasm. His job placement was at a Dollar Store where his boss was very accommodating. (Testimony of Amy Ramsey).

He went off of his medications the second year at LIFE Transition Center. His boss at Walgreens was less accommodating than the one at the Dollar Store. (Testimony of Amy Ramsey). C.D. received 30 minutes per week of social work services at the LIFE Transition Center in 2011-12. The services were provided in groups.  Individual services were available upon request. The March 15, 2012 IEP does not contain goals for social and emotional needs. (Testimony of Melinda McGuffin; Exhibits, p. 284). The school social worker at LIFE Transition Center was Holly Carollo, who did not testify.

The Glen Oaks IEP of March 12, 2013, provided 20 minutes per week of individual counseling and 200 minutes per week of group counseling and addressed "social relationships". (Exhibits, p. 208).

During this period  of  time the District also offered private counseling services for  C.D. through Have Dreams after listening to the Parent's concerns during

the series of Manifestation Determination Review meetings in January and February, 2013. (Testimony of Melinda McGuffin; Exhibits, p. 319). The Have Dreams IEP of April 23, 2013, provided 40 minutes per week of individual counseling and 200 minutes per week of group counseling. The IEP also provided for an individual aide for C.D. (Exhibits, p. 165). The IEP of November 7, 2013, provided the same amount of counseling services. (Exhibits, p. 54). A licensed clinical psychologist provided the counseling services at Have Dreams. (Testimony of Tom Dempsey). There was no evidence presented that C.D. had any major emotion melt-downs while at Have Dreams. There were no major incidents. This was because he was provided the proper structure and supports such as a written schedule, written visual support, practice scripts as to what he should say under certain circumstances, and discussions with staff in advance about scheduling changes. Staff also intervened directly when C.D. was having difficulty coping. (Testimony of Tom Dempsey). Have Dreams knew and was able to implement appropriate instruction and support for individuals with autism. (Testimony of C.D.)

**5.** **_Emotional Trauma_**

This hearing officer finds that the District did not inflict emotional trauma or damage on C.D. while he was in high school or at the LIFE Transition Center and Glen Oaks as claimed by the Parent. The incidents of emotional melting down described in the record (see, e.g., the testimony of Parent) may have been the result of inadequate staff training and knowledge regarding appropriate interventions for a person with autism in situations in which the person is frustrated, angry or having coping difficulties. I find that these incidents were due at least in part to inadequate social work and counseling services on an individual basis.

The emotional and behavioral incidents involving C.D. in high school, at LIFE Transition Center and at Glen Oaks are not atypical of an individual with autism. C.D.'s testimony comparing Have Dreams with the other programs he was in appears to be on target: Have Dreams knew how to intervene for a person with autism and that explains his success there. Another key factor for his success at Have Dreams was the provision of 40 minutes per week of individual counseling services by a licensed clinical psychologist.

**6.** **_Independent Educational Evaluation_**

The Parent requested an independent evaluation of C.D.'s emotional needs after the knife incident at LIFE Transition Center. The District offered the Parent an evaluation by Dr. Louis Kraus, a psychiatrist.. There was an objection by the Parent regarding the purpose of the evaluation and the disclosure of information by Dr. Kraus to the District. The Parent wanted an assessment of the emotional trauma she alleges that C.D. suffered during the time he was in high school, while the District offered the independent evaluation for the purpose of developing appropriate post-secondary transition and related services for C.D. The Parent

did not want Dr. Kraus to share his evaluation with the District's IEP team and did not sign a consent for the evaluation. (Exhibits, pp. 319, 323, 324, 329; Testimony of Melinda McGuffin). The Parent testified that while C.D. was at Glen Oaks an evaluation supervised by Dr. Hamilton, a psychologist, was conducted. She stated that she wanted C.D. evaluated at Alexian Brothers, but held off at the request of Dr. Hamilton.

Nothing in the record shows that a diagnostic evaluation of C.D.'s social, emotional and behavioral intervention needs was conducted from March 5, 2012 until he exited the program at Have Dreams the day before his 22nd birthday. Counsel for the District stated for the record that the District continues to be willing to provide an independent evaluation of C.D.'s emotional needs.


## CONCLUSIONS OF LAW

### Standard of Proof

The standard of proof in impartial special education due process hearings under IDEA is preponderance of the evidence. 20 U.S.C. 1415(i)(2)(C)(iii). Under this standard, the party seeking relief must establish that the fact sought to be proved is more probable than not.

### Compensatory Services

An award of compensatory services is authorized under IDEA for students whose eligibility has expired if the special education services provided prior to the expiration of eligibility are found to have been inadequate. *Board of Education of Oak Park-River Forest High School Dist. 200 v. Illinois State Board of Education,* 79 F.3d 654 (7th Cir. 1996). An award of compensatory services is an equitable remedy that may be awarded to students and parents under IDEA. *Minor T.G. v. Midland School Dist.,* 848 F. Supp.2d 902(C.D. Ill. 2012). The Seventh Circuit has not established an analytical approach for determining an award of compensatory services under IDEA. However, our District Courts have adopted a qualitative rather than a quantitative approach to an award of compensatory services, following *Reid v. District of Columbia,* 401 F.3d 516(D.C. Cir. 2005). See, e.g., *Petrina W. v. Chicago Public School Dist. 299,* 2009 WL 5066651(N.D. Ill. 2009); and *Minor T.G..*

The quantitative analysis uses a rote formula for determining compensatory services awards based upon the period of time the student is denied a FAPE. *Mary T. v. School Dist. of Philadelphia,* 575 F.3d 235(3rd Cir. 2009). The qualitative approach favored by *Reid* and followed in *Petrina W.* and *Minor T.G.* emphasizes a flexible approach that focuses on the individual needs of the student rather than a mechanical calculation of hours

## Independent Evaluation

Evaluation procedures under IDEA must assess the student in all areas related to the suspected disability, including, if appropriate, social and emotional status. 34 C.F.R. 300.304(c)(4), and are to be administered by trained and knowledgeable personnel. 34 C.F.R. 300.304(c)(1)(iv). The Parent of a student with a disability has the right to obtain an independent educational evaluation of the student at public expense if the Parent disagrees with an evaluation obtained by the school district. 34 C.F.R. 300.502(b).

The District failed to prove by a preponderance of evidence that the evaluations it conducted assessed C.D. in all areas of need. The District did not assess his social, emotional and behavioral needs in areas such as social interaction, social communication, inability to cope appropriately with frustration, inappropriate emotional reactions to certain circumstances and behaviors that clearly are part of C.D.'s disability. The incidents in December 22, 2012 (gun comment), January 8, 2013(knife incident), the problems he was having at his job placement at Walgreens in 2012 (Testimony of Caryn Hart), the brief suspensions from Glen Oaks and the terminations of his placements at the LIFE Transition Center and Glen Oaks in 2012-13 were obvious warnings that his social, emotional and behavioral needs were not properly assessed and that the interventions being used in some situations were ineffective and inappropriate.. C.D.'s subsequent success at Have Dreams showed that when appropriate interventions and supports were provided his emotional and behavioral needs were less acute.

Further supporting the Parent's request for an independent evaluation as a compensatory service is the District's offer to provide the evaluation by Dr. Kraus in 2013, and its counsel's statement on the record that the offer of an evaluation is still on the table.

The independent evaluation will provide C.D., his family and adult services agencies with important diagnostic information and recommendations for therapeutic services and perhaps medication. This information would have benefited C.D. had it been available during the time he was at LIFE Transition Center, Glen Oaks and Have Dreams.

The independent evaluation will also provide guidance to the District in providing compensatory counseling services. (See below).

## Compensatory Counseling Services

This hearing officer finds that the Parent has established by a preponderance of the evidence that from March 5, 2012, until he started at Have Dreams on April 23, 2013, C.D. was denied a FAPE because he did not receive appropriate individual counseling or social work services to address his social, emotional, and behavioral needs. The record is weak on the question of how much compensatory counseling time C.D. should be awarded to address his individual needs. There was no expert testimony on this issue. See, e.g., *Petrina W. v. Chicago Public School Dist. 299,* 2009 WL 5066651 (N.D. Ill. 2009). However, the District had offered the Parent 10 hours of outside counseling for C.D. in

March 2013 (Testimony of Melinda McGuffin; Exhibits, p. 319), This hearing officer finds that amount of individual counseling services at the District's expense to be sufficient to address the individual needs of C.D. and to be an appropriate award of compensatory services in the area of individual social, emotional and behavioral counseling.

## Compensatory Vocational and Transitional Life Skills Services

The Parent has not established by a preponderance of the evidence that the District denied C.D. a FAPE with respect to his vocational and transitional life skills services. There is nothing in the hearing record showing that the services provided C.D. since March 5, 2012 in these domains were inappropriate in nature and scope. The record clearly shows that he participated in activities such as work experience with job coaches, personal finance, homemaking such as cooking and housekeeping, self-advocacy, shopping and community living. The services and experiences were appropriate and tailored to meet his individual needs. Accordingly, no award of compensatory vocational and transitional life skills services will be granted.

## ORDER

It is hereby ordered as follows:

1. Within 30 days of the date of this Order, the District will schedule an independent evaluation of C.D. with a qualified mental health professional with knowledge and experience evaluating and treating adolescents and young adults with autism. The evaluator may be Dr. Louis Kraus, or another qualified mental health professional with credentials comparable to Dr. Kraus'. The evaluation will assess C.D.'s social, emotional and behavioral needs, and make recommendations regarding the services C.D. requires in the area of social, emotional and behavioral health that will assist him to function appropriately in the community, in employment and in post-secondary education and/or vocational training. The District will pay for the independent evaluation and, depending on C.D.'s preference, either provide round-trip transportation for C.D. for the independent evaluation, or reimburse the Parent for her mileage and expenses in accordance with the District's travel reimbursement policies.

2. Within 14 days after the issuance of a written report by the independent evaluator, the District will either arrange for, or approve C.D.'s choice of, an independent qualified mental health professional who has knowledge and experience in providing social, emotional and behavioral services to adolescents and young adults with autism. The District will pay for 10 one-hour sessions of individual counseling for C.D. with the qualified mental health professional, and, depending upon C.D.'s preference, either provided round-trip transportation for the counseling sessions or reimburse the Parent for her mileage and expenses in accordance with the District's travel reimbursement policies. The nature and

scope of the individual counseling sessions will be consistent with the
recommendations of the independent evaluator.

3. As a condition for having the District pay for the counseling services and
transportation described in #2 above, the Parent and/or C.D. will authorize the
disclosure by the independent evaluator to either the District's legal counsel,
or to an official of the District who is authorized to approve the counseling
services, sufficient to inform the District of the nature and type of counseling
recommended by the independent evaluator. The purpose of this condition is
to ensure that the services comply with requirements of this Order and are
consistent with the recommendations of the independent evaluator.

4. The request for compensatory services in the areas of vocational and transitional
life skills is denied.

5. Pursuant to 105 ILCS 5/14-8.02a(h), the District shall (a) submit evidence of
compliance with this Item #1 of this Order to the Illinois State Board of
Education no later than 35 days after the date of receipt of this Order, and (b)
submit evidence of compliance with Item #2 of this Order to the Illinois State
Board of Education within 90 days of the date of receipt of the Order.

## NOTICE OF RIGHT TO REQUEST CLARIFICATION

Pursuant to 105 ILCS 5/14-8.02a(h), either party may request clarification of this
decision by submitting a written request to the Hearing Officer within five (5) days of
receipt of the decision. The request for clarification shall specify the portions of the
decision for which clarification is sought. A copy of the request shall be mailed to all
other parties and to the Illinois State Board of Education, Program Compliance Division,
100 North First Street, Springfield, Illinois 62777. The right to request clarification does
not permit a party to request reconsideration of the decision itself and the Hearing
Officer is not authorized to entertain a request for reconsideration.

## NOTICE OF RIGHT TO APPEAL

This is the final administrative decision in this matter. Pursuant to 105 ILCS 5/14-
8.02a(i) any party aggrieved by this Hearing Officer's determination may bring a civil
action in any State court of competent jurisdiction or in a District Court of the United
States without regard to the amount in controversy within one hundred and twenty
(120) days from the date the decision is mailed to the party.

DATE: February 5, 2015

_/s/ Philip C. Milsk_____
Philip C. Milsk, Hearing Officer
328 East Maple Street, Suite 2D
P.O. Box 757
New Lenox, IL 60451-0757
(815) 293-7633
FAX: (815) 462-9165
philmilsk@hotmail.com

## CERTIFICATE OF SERVICE

I, Philip C. Milsk, Impartial Hearing Officer in the above-captioned matter, hereby certify that I served a true and correct copy of the foregoing Final Decision and Order upon the following persons by certified mail in accordance with section 14-8.02a(h) of the Illinois School Code on February 6, 2015:

Steven Glink
3338 Commercial Ave.
Northbrook, IL 60062

Laura Knittle
Franczek Radelet, PC
300 S. Wacker Dr., Ste. 3400
Chicago, IL 60606

Cynthia Nardella
2522 Silver Creek
Franklin Park, IL 60131

Dana Fattore Crumley
Franczek Radelet, PC
300 S. Wacker Dr., Ste. 3400
Chicago, IL 60606

Dr. Nick Polyak, Superintendent
Leyden Twp. High School Dist. 212
3400 Rose Street
Franklin Park, IL 60131

Amy Ramsey, Dir. of Special Ed.
Leyden Twp. High School Dist. 212
3400 Rose Street
Franklin Park, IL 60131

Andy Eulass
Illinois State Board of Education
Division of Special Education
100 N. First Street
Springfield, IL 62777-0001


_/s/ Philip C. Milsk_____
Philip C. Milsk